UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| ROBERT LEE THOMAS, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-875 |
| | ) | |
| v. | ) | Honorable David W. McKeague |
| | ) | |
| PAUL RENICO, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of life imprisonment without the possibility of parole, imposed by the Berrien County Circuit Court on May 14, 2001, after a jury convicted Petitioner of first-degree murder, MICH. COMP. LAWS § 750.316(A). In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

   I.   DEFENDANT WAS DEPRIVED OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY THAT DEFENDANT HAD NO DUTY TO RETREAT.

   II.  DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR FALSELY ACCUSED DEFENSE COUNSEL OF MISLEADING THE JURY DURING REBUTTAL ARGUMENT.

Respondent has filed an answer to the petition (docket #24) stating that the petition should be denied because Petitioner's claims are procedurally defaulted. Upon review and applying the AEDPA standards, I find that Petitioner's claims are procedurally defaulted. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

Petitioner was accused in the stabbing death of Gwenda Thompson in Benton Harbor on April 27, 2000. The Michigan Court of Appeals summarized the evidence presented at trial as follows:

> Gwenda Thompson and Thomas met in September 1999 while working for L.B. Anderson's plumbing and sewage business in Benton Harbor. At that time, Gwenda Thompson was living with her children's father, her son Keenan, her daughter Rashunda, and Rashunda's baby daughter. Thomas lived in a basement room of a house that belonged to his cousin, Charles Tunstall, and Charles Tunstall's daughter Mishannon, and two grandsons lived upstairs.
>
> According to Rashunda Thompson, Thomas would call for her mother once or twice a week, although her mother did not consider him a boyfriend. Rashunda Thompson recalled driving her mother, who did not have a driver's license, to or from Charles Tunstall's house on three separate occasions, and Keenan Thompson would sometimes come to Charles Tunstall's house either alone or with his mother to play with Charles Tunstall's grandchildren. Rashunda Thompson explained that her mother had used crack cocaine on a daily basis for the past ten or fifteen years, and relied on friends, family, and odd jobs for money to support her habit.
>
> Dwight Wilder, who also worked for L.B. Anderson, said that Thomas sometimes gave Gwenda Thompson money that he suspected she spent on crack. Wilder said that Thomas would always talk about Gwenda Thompson at work, telling Wilder that he "really liked her" and that he and Gwenda Thompson were physically intimate. However, Thomas was aware that Gwenda Thompson was seeing other men, and Thomas came to Wilder's house twice to ask if Wilder was seeing Gwenda Thompson. Wilder responded that they were just friends. Thomas also suspected that Anderson was involved with Gwenda Thompson, which, together with complaints about the low pay, led Thomas to quit working for Anderson.
>
> One day in April 2000, Thomas apparently picked Keenan Thompson up from school, brought him to the Tunstalls' house, and told Gwenda Thompson that he would not bring Keenan Thompson back to her, but rather was going to bring him to the police station. Rashunda Thompson recalled her mother explaining that Thomas had done this "because he wanted some ass." Gwenda Thompson called Charles Tunstall and told him that Thomas had tried to run her over and kill her, and demanded that Thomas return Keenan Thompson to her or she would call the police.

At Charles Tunstall's urging, Thomas did so. After this incident, Gwenda Thompson instructed Rashunda Thompson in no uncertain terms that if Thomas called their house again, she should hang up on him. Charles Tunstall reported that Thomas was angry that Gwenda Thompson no longer wanted to see him, and Thomas told Charles Tunstall that he was "going to put her to sleep."

The last time Rashunda Thompson saw her mother alive was the afternoon of April 27, 2000. Gwenda Thompson had asked Rashunda Thompson to drive her to an area of town that was known for drugs. When Rashunda Thompson refused, Gwenda Thompson left the house on foot. Later that evening, according to nine-year-old Shakeer Tunstall, Gwenda Thompson and Thomas went together into Thomas' room in the basement. At some point, Shakeer Tunstall saw Thomas come into the upstairs kitchen, take a knife from the "sharps drawer," and return to the basement. Shakeer Tunstall described the knife as silver with a brown handle and approximately a foot long, and testified that a demonstration knife the prosecutor offered into evidence was similar to the one he had seen Thomas take. Shortly thereafter, Shakeer Tunstall heard the sounds of bumping against a wall and screaming, although his testimony was somewhat confused as to which sound came first. Shakeer Tunstall tried to tell his mother what he had heard, but when she told him she was sleeping, he waited until his grandfather returned from his fishing trip later that evening.

When Charles Tunstall returned to the house between 9:00 and 10:00 p.m., Shakeer Tunstall ran out of the house to tell him that Thomas and Gwenda Thompson had been fighting. Although Charles Tunstall did not go to the basement, his fishing companion went downstairs to retrieve some laundry, and reported that he had "hollered at" Thomas, who was in his room. After taking his companion home and cooking the fish, Charles Tunstall and Shakeer Tunstall went to sleep, and Mishannon Tunstall left for work.

Between 5:00 and 6:00 the next morning, Charles Tunstall was awakened by the sound of Mishannon Tunstall's car, which he recognized by its loud muffler, leaving the driveway, and he heard it return approximately twenty minutes later. Charles Tunstall explained that Mishannon Tunstall allowed Thomas to use her car, a white Ford Escort, and that Thomas had the only set of keys. Charles Tunstall stayed in bed until 7:00 or 8:00, then rose to finish cleaning the fish he had caught the night before. At this time, he noticed that his sharpest butcher knife was missing.

That same morning, local resident Thomas Key noticed that a small, light-colored car was parked on Old East Main road as he went to work at approximately 6:00 a.m. Later that morning, Gwenda Thompson's body was discovered near this area, which was less than 1½ miles from the Tunstall residence. After an autopsy, forensic pathologist David Start concluded that Gwenda Thompson died from multiple sharp force injuries, of which there were at least thirty. Gwenda Thompson

- 3 -

had been stabbed in the head, back, arms, and hands, and her throat had been slashed down to her spine. Start testified that the wounds were likely caused by a single-edged kitchen knife similar to the demonstration knife that was admitted into evidence, and took at least thirty seconds to inflict. Start characterized the hand wounds as "defensive type injuries" that were consistent with Gwenda Thompson attempting to grab the sharp edge of the weapon.

After police identified the body, they notified Rashunda Thompson, who gave the officers a list of her mother's acquaintances, including Thomas. Officer Daniel Diekema and a partner interviewed Thomas from 11:30 p.m. until 4:30 a.m. on May 1, 2000. Thomas waived his right to an attorney after Diekema read his Miranda rights. Diekema then explained that Gwenda Thompson's body had been found, and that this would be the subject of the interview. Thomas told Diekema that he had been seeing Gwenda Thompson for a few months, but had not seen her since April 21, 2000. Thomas reported being at home all evening on the night Gwenda Thompson was killed, and denied that he or anyone else had driven Mishannon Tunstall's car that night or the next morning. Thomas denied any involvement in Gwenda Thompson's death, and signed a consent form to allow the police to search his room and Mishannon Tunstall's car. Police conducted the search while the interview continued.

At some point, officers interrupted the interview to report that the search of Thomas' room had revealed blood. Thomas offered no explanation why there would be blood in his room. Diekema then noticed a small drop of what appeared to be blood on Thomas' boot, which Thomas also could not explain. Officers took Thomas' clothing into evidence, and also took samples from under his fingernails. Diekema noted that although there appeared to be some bright red blood under Thomas' fingernail, he had no cuts, bruises, marks, or scratches on his skin. Diekema took photographs to document Thomas' physical condition.

After Diekema concluded the interview, Officer Robert O'Brien told Thomas that the search revealed evidence of a struggle in his room. Thomas then admitted that Gwenda Thompson had been in his room on the night she died. Thomas told O'Brien that he loved Gwenda Thompson, but that he had loaned her thousands of dollars to support her crack habit. Thomas said Gwenda Thompson came to his house on the night in question because she knew he would be receiving a disability check. When the conversation turned to money, he said that Gwenda Thompson became crazy and struck him 20 to 25 times with her hand. According to Thomas, Gwenda Thompson had a knife with her. Thomas told O'Brien that there were a lot of things about the fight he couldn't remember, but he knew Gwenda Thompson had died during it. However, he denied knowing how her body got to the side of the road or what became of the knife, which was never found.

>Thomas was charged with first-degree murder, and after a hearing, the court determined that he was competent to stand trial. Thomas filed motions to suppress the statements made during his police interview and to preclude the prosecution from introducing a similar knife as demonstrative evidence; however, these motions were denied. The trial took place over three days starting March 20, 2001. Thomas did not testify.

*People v. Thomas*, No. 234749, at 1-4 (Mich. Ct. App. March 11, 2003) (footnotes omitted), docket #31.

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on January 29, 2002, raised the same two issues as raised in this application for habeas corpus relief. *See* Def.-Appellant's Br. on Appeal, docket #21. By unpublished opinion issued on March 11, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. *People v. Thomas*, No. 234749 (Mich. Ct. App. March 11, 2003), docket #21.

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals. By order entered September 29, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. *People v. Thomas*, No. 123779 (Mich. Sept. 29, 2003), docket #22.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal

principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

**Discussion**

Petitioner first claims that his constitutional rights were violated when the trial court failed to *sua sponte* instruct the jury that he had no duty to retreat from an attack in one's own home. In addressing the issue on appeal, the Michigan Court of Appeals noted that both Petitioner and defense counsel expressly approved the trial court's proposed jury instructions. As a result, the court of appeals found that Petitioner "waived his right to challenge the instruction's omission, and thereby

extinguished any error." *People v. Thomas*, No. 234749, at 4 (Mich. Ct. App. March 11, 2003), docket #21.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004), *petition for cert. filed*, No. 04-8172 (6th Cir. Jan. 7, 2005); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule regarding jury instructions was well-established at the time of Petitioner's trial. *See, e.g.*, *People v.*

*Carter,* 612 N.W.2d 144 (Mich. 2000); *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985); *People v. Curry*, 437 N.W.2d 310, 314 (Mich. Ct. App. 1989); *People v. Kendrick*, 195 N.W.2d 896 (Mich. Ct. App. 1972). This contemporaneous objection rule serves an important State interest in ensuring that counsel do their part in preventing trial courts from providing juries with erroneous instructions. *See Osborne v. Ohio*, 495 U.S. 103, 123 (1990) (holding that failure to urge the trial court to instruct was an adequate state law ground to prevent reaching the federal claim). Therefore, Petitioner procedurally defaulted his claim by failing to object to the trial court's proposed jury instructions.

In his second ground for habeas corpus relief, Petitioner contends that he was denied a fair trial when the prosecutor falsely accused defense counsel of misleading the jury during closing arguments. In his closing argument, Defense counsel referred to the demonstration knife as "the big lie," asserting that the prosecutor's purpose in introducing it was to inflame the jury's emotions and to compensate for not having the actual murder weapon. Defense counsel then asserted that the "big myth is that Shakeer Tunstall saw my client take a knife from that knife drawer," explaining that Shakeer Tunstall was a young man getting his "15 minutes of fame and attention", and asking the jury why he should be believed. (Tr III, 577-80, docket #19.) In response, the prosecutor stated:

> Catch how defense attorney used the word big a lot. It's a big lie, big myth. That's his spin or his characterization of our evidence, and I guess I would respond only by saying that I think defendant's argument amounted to a big attempt to pull the wool over your eyes. A big attempt to get you to look at red herrings, things that are irrelevant or really just don't matter.
>
> * * *
>
> But I think the conclusion that [defense counsel] wants you to draw from that because we don't have the murder weapon is that maybe

>  somehow a knife wasn't used? But we know that's not true. Some knife was used. Is the conclusion that he wants you to draw that maybe there was a knife but that defendant didn't do it? That maybe Gwenda stabbed herself 30 times? We know that didn't happen either. Again, that's another big attempt to create an issue or to have you chase after a red herring that just doesn't need to be chased after.

(Tr III, 592-93.)  Petitioner did not object to the prosecutor's statements.

Again, the Michigan Court of Appeal expressly relied upon Michigan's contemporaneous objection rule in rejecting Petitioner's claim.  The court of appeals stated, "Because Thomas did not object to the prosecutor's comments at trial, this argument was not preserved."  Reviewing Petitioner's claim for plain error, the Michigan Court of Appeals found that the prosecutor's comments did not constitute error requiring reversal.  The court of appeals further stated even if the prosecutor's statements were error, it was not outcome determinative in light of the overwhelming evidence of Petitioner's guilt.  It is clear that the contemporaneous objection rule to statements made in closing argument was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Stanaway*, 521 N.W.2d 557, 579 (Mich. 1994) (citing cases).  Further, even though the court of appeals applied a limited review of the claimed error to determine whether it affected the outcome, Petitioner's failure to object is still considered a procedural default.  *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004), *petition for cert. filed*, No. 04-8376 (Jan. 24, 2005); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003) (citing *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000), and *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000)); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989).  Accordingly, Petitioner's second ground for relief also is procedurally defaulted.

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural

default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485; *Lucas v. O'Dea*, 169 F.3d 1028, 1033 (6th Cir. 1999). To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). In his supporting brief, Petitioner concedes that he did not object to the instructions at trial, but maintains that he did not specifically waive his right to challenge the instructional error. However, under Michigan law, Petitioner automatically waived his right to challenge the alleged error by failing to raise a timely objection to the proposed jury instructions. Moreover, Petitioner has not attempted to explain his failure to object to the prosecutor's comments at trial.

Even if Petitioner could establish cause, he cannot show prejudice. The Michigan Court of Appeals concluded that any error committed by the prosecutor during closing arguments was harmless in light of the overwhelming evidence of Petitioner's guilt. The court of appeals summarized that evidence as follows:

> A witness saw Thomas take a knife from the kitchen to the basement, and this knife was later discovered to be missing; Thomas admitted fighting with Gwenda Thompson in the basement; she had many defensive wounds and he had none; witnesses heard Thomas' car leave for a twenty-minute interval in the early morning; and a witness saw a small white car like Thomas' where Gwenda Thompson's body was found later that morning.

*People v. Thomas*, No. 234749, at 5-6. I agree that, in light of the overwhelming evidence that Petitioner committed the murder, he cannot show prejudice as the result of either of the errors asserted in his petition. *See Hicks v. Collins*, 384 F.3d 204, 215 (6th Cir. 2004). Accordingly, Petitioner cannot show cause and prejudice for his default.

Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray*, 477 U.S. at 495). Because Petitioner's claims are procedurally defaulted, they may not be reviewed by the Court.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  April 18, 2005                      /s/ Hugh W. Brenneman, Jr.
                                            Hugh W. Brenneman, Jr.
                                            United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).